Thank you, ma'am. May it please the Court. My name is Joseph Bianculli. I am pleased this morning to be before you to represent the Plott Nursing Home. Now, we start with the principle that most agency actions are entitled to deference. So the question before you is how do we get from that general rule to discussion of whether a particular decision is arbitrary and capricious with respect or under the APA? So the threshold issue becomes how much deference is due, this Court, to this decision. Now, the Fifth Circuit just a few weeks ago decided a case. We haven't cited it in the papers, obviously, because it's new, but I'll tell you about it. It sets a pretty good framework for addressing this issue in exactly this context. It was an appeal from a Departmental Appeals Board decision in a nursing home case. It's as yet unreported, but it's called Elgin Nursing and the Fifth Circuit a couple of months ago. Is there a 28-J letter? I'm sorry? Is there a 28-J letter? Did you file a supplemental notice of authority? We did not. Okay, so let's make sure we've got it. 12-60086 Elgin, E-L-G-I-N? E-L-G-I-N. All right, thank you. That's right. I mean, the Court put it well in the context of a Departmental Appeals Board decision, but the principles are not new, of course. What they said is first, if the board imposes liability on the basis of ad hoc interpretations of regulations or manuals, what the Court called interpretations of interpretations, or if you get down to the interpretations of the manuals, interpretations of interpretations of interpretations, or specific opinions and judgments by surveyors, where the board has not given, or CMS has not given, specific notice to the nursing home to which nurses are being regulated or sanctioned of exactly what's a violation, then there's no deference to the board's legal judgment either in that case. And so the question becomes, what do you do with the decision then? Does this court review the record? You've obviously got better things to do. Do you send it back to the board? Well, the board's been kind of a rubber stamp for the last five years. Or do you do what the board says that it should do in that case? And that is, where the government has not met those two standards, you know, in its case, in its, during administrative appeal, where CMS has not demonstrated a violation by those two tests, then the case is over. And the board actually said that that's the rule. How do we get very far on that? How do we get very far on that in this case? With the bed sores and the urinary tract infections, it looks like it's a battle of experts, and the board has its, well, possibly pet expert, but they also have a very liberal standard of review. Right. Let's show you how that test applies here. I'll take for an example, and obviously I'm not going to go through the entire case, but let's look at the key evidence regarding the resident. Are the bed sores and the urinary tract infections the artifact? Right. Let's look at the key evidence regarding the resident who suffered the recurrent skin breakdown. And that is, was the facility responsible either for the development of it or for not providing appropriate care once it opened? So the government says in their briefs that the board was correct to find that the wound opened in December of 2007 and actually never healed until much later, well after the resident went to the When you say the government, are you talking about the appellate administrative decision or are you talking about the government's brief? Well, that's an excellent question, because the government's brief is not consistent. We don't defer to the government's brief. Well, I guess in some circumstances we do, but probably not here. Right. The government in its brief, right, is not saying exactly the same thing that the board said. What did the board say? The board said that the ALJ noted that the wound opened and closed a number of times. That's in the board's decision at page six of the excerpt of record. The board then sets forth its own chronology of what it thinks happened, which was different than what the ALJ said. And that's at page nine of the excerpt of record. So the ALJ said it opened and closed a number of times, and he had various critiques. The board said, we read the record differently. We don't think it opened and closed all those times. We think it stayed open for this time, closed this time, and we have a different view of what we think did wrong. And then the government in its brief says We defer to the board. We don't defer to the government's brief, and we don't defer to the ALJ. Right. So I'd appreciate clarity when you're talking, which entity you're talking about as you talk. Fair enough. Fair enough. Because if you look at the government's brief, the brief, they don't describe properly what the board found. What the board said was that it opened and closed, but not when the petitioner said. And so we read the evidence differently. So in our brief, we have given you citations to the evidence that shows exactly what the petitioner did, when they did it, and what happened to the resident. So, for example, the wound opens in December. It closes in January because of the treatment that the petitioner gave. The board says, you didn't do anything in December. We don't like the treatment you gave. It never closed. We read the records differently. Well, you can look at the portions of the resident's chart that we cite, right, and that we cited before the ALJ, before the board, the whole time through. For example, in the excerpt of records, page 208, is an assessment that says that the area closed by January 28th. In the excerpt of record 199-211 are assessments that show that the area stayed closed in March. Was there any evidence to the contrary that it did not close in January? Absolutely not. Absolutely not. Setting aside whether it closed or not, there was a pressure sore. And the question, it seems to me, is what response was made to the pressure sore. And what I read in the record is there's real questions about whether the doctor's direction to give her this very special kind of low-air mattress was ever carried out. There's an entry at excerpt of record 176, which indicates a late entry for June 9th, 2008, for pressure relief mattress. And when the surveyor was there in September, it appeared that the mattress was not in the room. Right. A late entry is an entry that a nurse makes into a record for previous dates. That's earlier. And that was made during the survey when the surveyor questioned what, you know, when this low-air loss mattress was provided. And what apparently happened was the nurse went back and found the invoice to show when they had gotten it, went and made that record. But, counsel, when the surveyor was in the room, the mattress wasn't there. The mattress was there. And, in fact – Can you point to a place in the record where that is established, please? Absolutely. There are two entries in the physician's notes in August in which he says continue using this low-air loss mattress. Right. And the survey was in September, wasn't it? That's right. And the surveyor indicated the mattress wasn't there. Isn't that right? The surveyor never testified. The surveyor never testified at the hearing that the low-air loss mattress was or was not there. Right. This – and, again, remember, this gets to the bigger issue. This was one of 96 things that was addressed at this hearing. And so now we're focusing on this. But at the hearing, we were focusing on a much different set of deficiencies that involved things that are not before you because they never – Let me ask you something. You can look at the transcript, and the surveyor never got to that point. What they did was they asked one of our nurses, and she said it was on the bed during the survey. And that reference is not to a surveyor. It's to one of our nurses who said that. I'm sorry. I interrupted you both, I think. Please, go ahead. On the many things in the survey where there never was a board decision, I'm a little unclear on whether you think – oh, I don't know exactly what you call it, but whether they should all be dismissed as a matter of record or whether we should remand so that there can be a board determination on all those matters where there was no final adjudication. Well, we think they should be dismissed because CMS didn't meet the standard. Why wouldn't we remand so that they could make findings on them all? Well, you certainly could. The Eighth Circuit suggests that you could go either way, that either you could remand it back so they either make findings or dismiss them. But our suggestion is that if you're going to hold the board to the standard that it says it uses, and that is that CMS has the burden at the hearing to come forward with evidence to show the prima facie case, and that if it fails to meet that burden, then the deficiency gets dismissed. And our suggestion is if the ALJ never says that CMS has established a prima facie case and the board never says that CMS has never established a prima facie case, that we should not be put in the position of having to appeal to you to go back to them to say one way or the other. They both had the opportunity to say one way or the other, and what they say is we're passing on the matter. We're letting it stay on the record as if CMS proved that it was a valid deficiency. If you go look at the website, you will see that all of those deficiencies are still on the record, right, even though nobody has ever found that CMS established a prima facie case in noncompliance. So, I mean, if you're going to require the board to apply its own rule, then you dismiss. You say you've had your chance to make that finding and you didn't do it. But my point is, of pointing to specific points of evidence in the record, for example, with respect to the bed sores or with respect to the urinary tract infections, is the board didn't do that. The board said we read the record to mean this. We interpret the expert's testimony to mean such and such. They don't look to the ALJ. They said the ALJ got the medicine wrong. Even assuming that the ALJ didn't understand it and that his decision was wrong, et cetera, we are going to look at this de novo. We are going to make our own independent judgments from looking at documents, what they mean. And when you look at their decision, it is filled with inaccuracies. They say, for example, we infer that poor care was given to the skin breakdown because the wound never, you know, closed. When you look at the documents that show the wound, in fact, closed. And so when a resident gets a skin breakdown and you provide care to the resident and the wound closes, the staff figures, well, the treatment we provided, the physician ordered, worked. And so if it's the kind of wound that has a tendency to reopen, then we will provide the same treatment again and again. It worked. And if it keeps working, right, then you're meeting the intent of the regulation. The board goes off on a tangent. No witness said, well, if it can close, you know, if the resident has the physical resources to heal the wound, then it shouldn't recur. No witness said that because that's not the medicine. Did you say that the record that shows that the board just plain got that fact wrong and there's no substantial evidence is ER 208? To the extent that they, for that particular point where they say it didn't close and the government's now making that sort of argument. That's what I'm asking about. Right. It says. It's hard for me to read 208. Could you help with that? These are wound evaluation reports. You can see it covers two weeks of time. The first half on the top of the page, you see the date up in the upper left corner, it says 123, talking about the wound on the sacrum, and then there's, you know, it shows you the size and so forth. It's in the second part on the bottom where it says 128, right, and it says, if you go right to the center of the page, it says wound edges, and there's a checkmark. Oh, I see. It says closed. And then if you look at the measurements, it says zero by zero by zero. Where's the measurement? In the box with the circle on the left-hand side. I see. The nurse has to measure the size of an open wound. You can tell whether it's getting better or worse. And you see length zero times width zero times D is depth zero. And then the checkmark, and it says closed. And if you look over on the far side also on the comments, it says area closed. And that's on 123? The date was 123? No, 128. 128. Right. And you can go through. I mean, the following pages, some of them are out of order, but they go through. They continue to assess the wound, right, and you go through, and then you get to May, and then it's described as a pink scar for the three days before the resident goes into the hospital. The resident goes into the hospital with a urinary tract infection, and on the third day she is in the hospital, the hospital notes, and, again, I can give you the citation to that. It's excerpt of record 144 and 146. On June 2nd, the hospital notes that the area has reopened. So on May 30th, it's assessed as being a pink scar. That's excerpt of record 202 and 203, right? Three days after she goes to the hospital, the hospital notes it's reopened. Now, it's not plausible the hospital didn't notice an open wound for three days. So the hospital record also shows that the resident is agitated, that she's got an infection, which makes wounds worse, and so it reopened when she was in the hospital. She comes back to the facility. They say there's no new orders. Yes, there are, in fact, new orders given on June 5th. That's excerpt of record 161, right? The treatment plans are in there. They show the treatment through July and August and shows, again, it's closed in August, and that's excerpt of record 164, 192. My point is, throughout the brief, we show you how the board has disregarded this kind of detailed review of the record, right, with respect to both of the deficiencies that it upheld, right, and instead it just is making boilerplate statements about care plans and treatment and what nurses should do without actually reviewing the details of what the nurses actually did. And so you get right back to that Elgin standard. If they get the facts wrong, no deference is due to their fact-finding, and then if they start coming up with all these what nurses should do that is not written down anywhere, things like, you know, nurses should be reviewing lab tests and this and that, then no deference is due to the legal standard. Is this all premised on us adopting the standard in the Fifth Circuit from the Elgin case? No. That is their description of how the arbitrary and capricious standard ought to apply in a case like this, which is based on a mixed finding of fact and law, where the fact finder – A Ninth Circuit case that's comparable to that. There has never been a Ninth – that I can find a Ninth Circuit case involving a nursing home appeal under these regulations. There are three or four of the circuits that just have never addressed this issue yet. But I cite the Elgin case because I think it's a very practical way to apply the arbitrary and capricious standard. Thank you, counsel. Do you want to reserve some time? I think I'm over, but if I could have a minute or two. We're over. That's all right. Thank you. May it please the Court, Helen Gilbert for the government. I'd like to clarify a few things that I think my colleague was slightly inaccurate about in characterization of both the record and the appropriate standard of review here. First, I haven't reviewed the Fifth Circuit case because there was no 28-J letter, but I'm, of course, happy to, to the extent that it's helpful. But Congress has actually specified the appropriate standard by statute here. And that's found in 42 U.S.C. 1320A-7A subpart E. And in that provision, Congress specified that the findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. And as the Court has already acknowledged, that's a quite deferential standard. Not totally. Substantial evidence on the record as a whole. It's just the old universal camera standard codified. And it means any shred of evidence won't do. Even evidence that's right on the button won't do. It has to be evidence that's supported by the record as a whole. And I'm concerned about whether it is. What your opposing counsel showed us in the record is that it looks like she got bed sores and they healed quickly. Your Honor. It looks as though the record's not too clear on whether she had the air mattress. I can't remember exactly what it's called, low air mattress or something. It isn't really clear whether she didn't have it. Your Honor, actually, the record is quite clear in this case and fully supports the Secretary's explanation. Okay. Show on those two things why the record did not show that the bed sores healed in January and that she had the low air mattress. Let me walk you through, Your Honor, on the first question of when the bed sores healed. We've got the excerpt. Yep, I have it right here. So I think it's helpful to turn to page 199 of the excerpt to record, which the board and the ALJ both cited. And I'd like to also note that the board and the ALJ and our brief today are all consistent in noting the dates at which the pressure sores were open. But on 199, I know it's hard to read, but at the very top you'll see the date is February 22, 2008, where it notes that there is still an open sore. So the petitioner is inaccurate to say that it was closed by January. It was actually open again in February. What's the next entry, counsel? The next entry is ER 210, which indicates the pressure sore was open from March 13th to March 20th. How does that show that it stayed open as opposed to that it closed and then she got another bed sore? Oh, Your Honor, we've never – the Secretary has never alleged that it stayed open for that entire time. The board's decision, which is found at ER 6, specifically notes the individual days that the pressure sores had opened and notes that the petitioner doesn't contest that the sore opened and closed repeatedly during this almost nine-month period. So after ER 210, what's the next entry? And this is – I apologize, it's out of order. But the next one is ER 202 to 203, which indicates that the pressure sore was open from May 23rd to May 30th. Okay. Then we note that we, of course, acknowledge that this resident was hospitalized from May 30th to June 5th. That's available at SCR 24 and ER 160. How does the reopening of bed sores after they had closed show inadequate care? Your Honor, the key issue here is that the regulations specify that the facility has to do anything it can to make sure that pressure sores are avoidable. Isn't this about the response to the pressure sores? Absolutely. And so in this case, you had – the resident entered the facility in June 2007. At that point, the resident did not have any bed sores or pressure sores, as the facility calls them. But it noted she was susceptible to skin breakage. And so it noted in her long-term care plan we should be careful here. Then the resident starts to develop bed sores. Now, they closed, which is a good thing. It shows that her body is able to actually heal. Well, and it might show that they're being treated appropriately. But anyway, what we know, since we're not doctors, is that they closed and opened and closed and opened. Exactly. So can you talk about the response? What's the record show that the facility did? The problem is the facility did two main things wrong. One, it did not update this individual's care plan after all of these incidents of pressure sores. So you have pressure sores from December through February, which we've already noted. There's no change to that long-term care plan. Well, I think – forgive me for interrupting, but what I think that means is that it seems to me that these wounds opened and closed and opened and closed. And when you say that the facility did not update her care plan, it seems to me that they treated these on an ad hoc basis rather than updating the standard operating procedure, the ongoing treatment and care plan for this patient. Exactly. So the facility responded to the very short-term issue, but never to the long-term problem. It's a problem if you have a resident like this who continues to get bed sores. Okay. So, counsel, can you look for me and explain about this, the mattress? This is what I'm focusing on because of the long-term care plan for this patient. And at ER 166, 169, August 7th and August 14th, the physician is saying, Okay, which I think is a term of art because it seems to me at ER 52 and 54, the standard pressure relief mattress, which is a different thing, I think everybody in that facility had a standard pressure relief mattress, whether they had bed sore history or not. Is that your understanding? That is not my understanding, Your Honor. So I think – can I walk you through the two mattress issues? Please. So first with the pressure relief mattress. All right. The care plan, which was done in June 2007 when this resident entered the facility, says we need to provide her a pressure relief mattress. That's found at ER 178. Okay. So I have that note, but is that mattress a standard pressure relief mattress? That's different than what everybody gets? I understand that at the time she entered the facility, she didn't receive that. It may be true that other – I don't know. The record doesn't indicate whether other patients have that same mattress. But what's important here is that although the facility noted in June 2007 she should receive it, she didn't actually get it until a year later, June 2008. Well, that's why it matters what mattress we're talking about. That's why it matters whether there's a difference between a low-air mattress and a standard pressure relief mattress. Right. And there is, Your Honor. That's reflected in the record. The testimony, I believe it was, of Surveyor Nichols in SER 48 through 54 shows that there's a difference between the two. Right. So that's what I was saying earlier, counsel. It's at page 53 that the facility said, the standard pressure relief mattress is for residents with or without pressure sores. So is that your understanding of what she was supposed to get as of the date she entered the facility in June 2007? Yes. Okay. All right. Continue. So the first problem is they said she – She got it. It looks like the recommendation here at ER 178 is the pressure relief mattress. And I don't know of any evidence that she didn't get a pressure relief mattress. I thought the only issue was whether she got the low-air mattress. Now, it may be that – I'm not getting the words. I thought pressure relief mattress was like one of those pads you get at Sam's that just makes your mattress conform to your body better and it's softer, so you're less likely to get bed sores. And the air relief mattress pumps air in and out so that the pressure changes all the time, so it's a little bit like a water bed. I think the record shows that they're different and that the low-air mattress was an additional intervention. But I'd just like to note that the record is clear that this resident didn't receive that low-air mattress – excuse me, the pressure relief mattress until June 2008, and that's found at ER 176. That says late entry. It says late entry for June 9-08. So a year after she entered the facility? Exactly. That's a full year. For pressure relief mattress. But I don't know if that pressure relief mattress is the standard one or the low-air one. And the ambiguity is created by this August of 2008 entry where the physician says, continue low-air loss mattress. Correct. And I think there's – and I agree, and the board and the ALJ acknowledge that the continue, the low-air loss mattress is a bit – is not quite as clear as it could be. But there is evidence in the record showing that, one, the low-air mattress is different. Two, that the physician in August 2008 noted that she clearly needed to use it, which is what the secretary found in the decision. And three, that this resident wasn't provided that until at the very soonest, that last date of the survey, September 24, 2008. I thought that was all consistent with what the doctor said. The reg isn't quite the way you described it. It doesn't say whatever is possible to relieve bed sores. It says a resident having pressure sores receives necessary treatment and services to promote healing and prevent new sores from developing. Necessary treatment and services is a little different from all that could possibly be done. And then I look at the record. It's really hard to read, and I may be really misunderstanding this. My understanding of it is the doctor said, give her the pressure relief mattress, and she got it. But she kept getting bed sores, so the doctor said, give her the low-air loss mattress, and she got it. Two things, Your Honor. First, the regulation has a Part C1, which says, a resident who enters the facility without pressure sores, which everyone agrees this resident entered without pressure sores, does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable. Right. And you lie in bed a lot, they're unavoidable by and large. No, not necessarily, Your Honor. The board has a plethora of decisions setting forward the standard. Costal Pavilion is one such decision where it says, the facility must ensure no resident develops pressure sores unless clinically unavoidable and should go beyond merely what seems reasonable. You get them up to walk. That's what they do. They get even patients with terrible surgery up to walk, and they make them go up and down the hall. But I think this one, didn't she have to have her hands restrained because she was tearing open her skull wound? Yes, Your Honor. After she returned from the hospital in June 2008, that's exactly what happened, which is at the time when you would think they would have given her the low-air mattress, but they didn't. They said in August she should receive it. She didn't get it until September 24th, and during that time, she had pressure sores. Right there, because I am focused on their response to pressure sores. I tend to agree. What I think Judge Kleinfeld is suggesting is that sometimes people get pressure sores and are not convinced that it's always avoidable. To me, it seems to be very important under the law here that we focus on the facility's response to the pressure sores. So maybe that's a debatable point, but if you could just go with me here for a minute, because I really want to focus on their response, and I'm having a hard time with the record. Opposing counsel says we've gotten up to this June, forgive me, the late entry. Correct. For the pressure relief mattress, and then opposing counsel says that the surveyor was in September. Yes. Okay. As of the time of the surveyor, that the surveyor didn't testify that when the surveyor was in the room, the mattress wasn't there. What's your understanding of that point? It seems to me very important. Correct, Your Honor. So the first surveyor, Nichols, testifies that she did not observe the low air loss mattress in this resident's room during the survey, which ended on September 24th. Okay, so where in the record is that? That's SCR 48 to 51. Nichols says it wasn't there. And page 54, Your Honor. Okay. And then also, it's Nurse Wagner, who was petitioner's witness for the hearing, also testified that this resident had the pressure relief, not the low air mattress, during the survey. And that's at SCR 61. Okay, so that's what I'm calling probably inartfully the standard mattress. Exactly. But a standard for that facility, which is a pressure relief mattress, but not the low air one. Is that right? That's correct, Your Honor. Although it's unclear if that was standard, because keep in mind, the facility itself in June 2007 said, this individual is susceptible to pressure sores. We need to avoid them. She needs to get this pressure relief mattress. She has pressure sores from essentially December through June, and only a year later in June do they say, oh, right, we should give her the mattress we decided a year ago she should receive. That's why it's so important to know, and this is another inconsistency, because I think you agreed that everyone in the facility has a pressure relief mattress. No, Your Honor, there's not the low air mattress. That's not necessarily clear from the record. I don't know, Your Honor. Okay. I only know that this resident was supposed to get the pressure relief mattress in June 2007. They didn't give it to her until June 2008. When you say pressure relief mattress that you think she was supposed to get in June of 07, that's upon her entry into the facility. Exactly. Do you mean low air mattress? No, Your Honor. I mean pressure relief mattress. Okay. So Wagner is the nurse. Forgive me. Can I get the site again to where she testified, what mattress? Of course. It's SER 61. All right. And is it your understanding that she said that, was she referring there to a particular time? Yes. She said during the survey, and the survey was conducted up until September 24, 2008. Okay. During the survey, this resident had the pressure relief mattress. Let's call that mattress one. Okay. And that's consistent with the surveyor's testimony that she did not see mattress two on the resident's bed. And mattress two is the low air one. And mattress two will be the low air mattress. All right. I like mattress one and mattress two. All right. It's a little bit easier. Okay. But I think that the other problem here is that, again, the facility was not responding with other possible interventions. I'm confused about something about what you just responded to Judge Christian's questions. It sounded like you were talking about the survey. But when I looked up your citations, all of them, they're all from the decision. But our question is whether the decision is supported by substantial evidence on the record as a whole. So saying it's in the decision can't be the evidence that supports the decision. And you didn't cite pages to the survey. You cited S.E.R. pages, every one of which is in the decision from the Civil Remedies Division Departmental Appeals Board. I think, Your Honor, I apologize. I wasn't clear. I meant the supplemental excerpts of record. So if we go there, you think those are transcripts? Yes, those are transcripts from the testimony at the hearing. I apologize, Your Honor. I know the record is quite large. I must have just looked in the wrong book. That's okay. It's my fault. We're just really trying to nail this down. I know. I completely understand. Can I ask you about something else? Is it okay if I ask another question? Of course. There are a whole bunch of things that were unadjudicated, just a few things that were adjudicated. It had very much the look to me, and we've got two cases that are similar, and I can't remember where the ALJ said it looked to him, kind of like a training program for a bunch of new surveyors to spot everything they could that might be contrary to the regs, sort of like when you're a first-year law student and you walk back to your apartment spotting torts and stuff like that. And I think we all did that. And I can see why they wouldn't adjudicate everything. Some of this stuff sounds kind of silly, actually, like they don't have music and movies in Chinese. I guess there was one case where it was cited. It wasn't this case. The surveyor says they don't have music and movies in Chinese for a woman who's a Chinese speaker, but she hasn't asked for movies and music in Chinese. Most music is in notes, actually, and her family didn't ask for music in Chinese. And this looked like that kind of thing, and I was thinking if you don't adjudicate them, It's a little like if you read a TripAdvisor review on a hotel. A nursing home is a really long-stay hotel, and the TripAdvisor review says there were bedbugs, cockroaches, and spoiled meat at dinner. And you give them an adjudication on the bedbugs and the cockroaches, and you leave the spoiled meat accusation out there on the government site, and it affects the rating that it's a one-star instead of a five-star. But they never get to have anyone review whether there really was spoiled meat at dinner. That seemed unfair. Now, the plaintiff says that anything that wasn't adjudicated should be dismissed. Maybe it should be remanded for adjudication, or if the board chooses not to adjudicate it, dismissed. I don't know, but I don't quite get why you could put all the unadjudicated violations on the government website. I mean, that's the way it is.  It's the way it should be. They reduce the quality rating of the place, they're available to the public, and they expose the nursing home to harsher penalties if there are subsequent violations and never give them an adjudication on these things. Two points, Your Honor. First, this Court doesn't properly have jurisdiction over those unreviewed deficiencies today. This is a direct petition. You're saying we should wait until nobody works there anymore, everybody's forgotten, the evidence is unavailable, and adjudicate them several years down the road if they get an enhanced penalty. That was what your brief said, and it makes no sense at all to me. Your Honor, the only – The only justification for it is there's no penalty now. But the penalty, it strikes me, it's very much like, oh, somebody's convicted of a crime, but they get suspended imposition of sentence, no conditions, no jail, no restraints, and you say, well, we'll just wait until it enhances the subsequent sentence. That's not right. But, Your Honor, that's actually not quite the analogy, though. I mean, in that case, they are convicted of a crime. Here, the only adverse action is the imposition of a remedy. Well, not if you're trying to run a facility, and these are publicly available demerits, which is Judge Kleinfeld's point. Let me ask you this. Do they have any avenue for refuting those, for trying to contest these other unadjudicated deficiencies, alleged deficiencies? Your Honor, there is an informal dispute resolution process set forth by REG where the facility is able to go to the surveyor and present evidence before all of the hearings begin on the remedy imposed. That's one avenue. But the second is to the extent that they have a serious due process claim, which they haven't alleged anything other than speculation here about any adverse harm, but to the extent that they do have real harm, we certainly are not saying that judicial review is foreclosed, only that it's not appropriate in this case. So the alleged harm is that this agency has found that the facility has these deficiencies, quite a number of them, and those are publicly accessible, right? They are, yes, Your Honor, by statute. All right. And you think there's a different administrative avenue for them to challenge those, just not this case? Correct. This is not the appropriate avenue. What is the avenue? You say they can argue with the surveyor, but they're trying to go above the surveyor's head. That's the whole point of an appeal. And you say they can dispute it when they get a penalty enhancement in a subsequent case. But that doesn't help them any on people saying, well, I'm not going to put my mother there. Your Honor, if they really have an adverse, if they really are harmed by those ratings, they could bring an action in district court. We're not contesting that they couldn't do that. It's just, and they would have to meet all of the normal threshold arguments, you know, jurisdiction, standing, all of those things, and bring a suit. But that's not this case. This is a ---- Your only argument is that they're not adversely affected, and I don't understand why they're not adversely affected if the reviews and ratings are public. Well, Your Honor, I mean, I think there are a number of steps you have to get to. Further jeopardy on a subsequent case. But if there, I mean, for instance, if this was a due process challenge, you would have to meet a stigma plus analysis. And for corporations, the plus has to be quite strong. A lot of cases show that it has to be loss of employment or that the facility is shut down. But none of that is appropriate before the court. I mean, that's a very different bag that we do not contest that petitioners could seek for the review in some other fora, just not here. We're limited by Congress's statute. We understand, counsel. Thank you. Thank you. Counsel, we'll give you a couple more minutes. We kept you over. Thank you. Very kind of you, Judge. Judge, I want to respond directly to your comments and your questions about what the transcript actually said about that low-air loss mattress. Thank you. On supplemental record, page 50, the government lawyer is asking questions of the surveyor. And she says, where were these located? The sacred toxics area. All right, did you see anything in the record to indicate when Resident 24 received a low-air loss mattress or a low-air loss mattress? Surveyor says, no. She says, taking a look at page 247 of Petitioner's Exhibit 11, okay, there's an entry, 924, low-air loss mattress. Did you see that during the survey? She says, no, I did not. Then she moves on to a different topic, without ever clarifying whether the that is the entry or that is the mattress. But the surveyor had just said she didn't see anything that indicated when she got the mattress, which implies that it was already there. If you go further on. I think she's referring to lines four through six. Did you see that, meaning the low-air loss mattress, 924? And she says, no, I did not. Right. Does that mean, did you see the entry in the record, or did you see the mattress? I didn't read it that way, because, no, it did not seem to be, what did you see? Well, the context was, did you see the entry in the record? Because she's asking, because remember, the petitioner is saying, look, here's the care plan that had a late entry, the implication being that that was put in after the surveyor questioned it. I get it. Now I get it. And they went back and looked for it and found it. So what about Nurse Wagner? Oh, forgive me. You're not done. Two pages further on page 53. Okay. The surveyor is asked, do you happen to know what color the facility's pressure-reducing mattresses are? Blue. So did you conclude that this was not a pressure-reducing mattress you were looking at? She says, it was a pressure-relief mattress. I was told by the facility that it was the facility's pressure-reducing mattress. But we're talking about a different. Exactly. That's mattress one, right? Different resident. We're talking about a different resident here because they had alleged skin breakdowns for more than one resident. So how does this help us? The board went back and they glommed it all together, and they confused this testimony to mean that it was all talking about this resident and that. What about Nurse Wagner's testimony? And then you go to Nurse Wagner's testimony, which is a few pages, I believe, further on. All right. Page 60. Supplemental record actually is on page 62. The transcript number is pages 853 up there. Now, toward the bottom there is an entry date of 924, low error loss mattress. Yes. Was that error loss mattress ordered on 924 or put in place 924 for that resident? And she says, as far as I know, I saw it on her bed at a point in time I couldn't tell you the exact date. Okay. But it would be about that time? It would be around that time. All right. Then below that there's an entry, and I'm wondering if you could read that for me. I can't get the date. Let me try it. Tell me if I'm wrong. 10-4-8, and then it's a late entry, meaning late entry for 6-9-0-8 pressure-relief mattress? Yes. That's what it says? Yes. So, again, it's garbled. She doesn't say she got it then. Remember, she's testifying a year and a half later, two years later. She says, it was around that time I saw it. Well, why isn't that substantial evidence supporting the finding that she didn't? Well, because it's inconsistent with the documentation by the doctor, which was contemporaneous, a month before September. Well, that's the entry that's vague, right? That's the entry that says continue. Right, the continue low air loss mattress, and that's on two notes a week apart by the doctor. All right. Just very, very briefly, this resident was admitted with skin breakdowns. Remember, she had a skin breakdown on her scalp for years. That's way over time, so if you could finish up your last thought, that would be helpful. All right. And with respect to the notion that we didn't update the care plan, remember, each one of these wounds was treated pursuant to a physician order, and that is, in fact, part of the care plan. When counsel says care plan, she's referring to a document that says on the top, comprehensive care plan, or short-term care plan, or long-term care plan. But the board has held many times that all of the resident's treatment orders, and all of them that are available to the nurses, which, of course, the treatment orders are, all are part of the care plan. So, again, that's not an accurate statement, but it's also not what was cited. There was a specific regulation that deals with inadequate care planning that was not cited here. Thank you, counsel. Thank you very much. Appreciate it. Thank you for your arguments. The case to start will be submitted.
judges: Sedwick, Kleinfeld, Christen